UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                     Case No. 16-cr-20723
                                      Hon. Mark A. Goldsmith

vs.

MARIA ELENA LEYVA,

        Defendant.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (Dkt. 39) AND**
**DENYING DEFENDANT'S MOTION TO SUPPRESS RESULTS OF SEARCH**
**WARRANT (Dkt. 40)**

Defendant Maria Elena Leyva is charged with (i) conspiracy to possess heroin with intent

to distribute; and (ii) attempted possession of heroin with intent to distribute, in violation of 21

U.S.C. § 846. This matter is before the Court on Leyva's motion to suppress her statements made

on October 23, 2016 (Dkt. 39) and Leyva's motion to suppress the results of a search pursuant to

a warrant (Dkt. 40). A hearing on both motions was held on August 14, 2017, and supplemental

briefing followed. For the reasons that follow, the Court denies both motions.

## I. BACKGROUND

On October 20, 2016, law enforcement in Amarillo, Texas stopped a vehicle driven by

Leyva's co-defendant, Richard O'Dell. Def's Br. in Supp. of Mot. to Suppress Statements at 1

(Dkt. 39); Gov't Br. in Opp. to Mot. to Suppress Statements at 4 (Dkt. 49). The vehicle contained

5.6 kilograms of a substance that tested positive for the presence of heroin. Def's Br. at 1; Gov't

Br. at 4. Law enforcement seized the suspected heroin, and replaced it with "sham" heroin. Def's

Br. at 1; Gov't Br. at 4. The officers worked with O'Dell to conduct a controlled delivery of the

sham heroin in the Detroit metropolitan area.  Def's Br. at 1; Gov't Br. at 4.  The sham heroin was wrapped in eight separate packages and placed into a brightly colored gift bag.  Def's Br. at 1; Gov't Br. at 4-5.  On October 23, 2016, law enforcement observed O'Dell deliver the brightly-colored gift bag to Leyva in Warren, Michigan.  Def's Br. at 2; Gov't Br. at 5.  Officers then followed Leyva to a hotel in St. Clair Shores, Michigan.  Gov't Br. at 5.

### A. Pre-<u>Miranda</u> Statements

At approximately 1:29 p.m. on October 23, Drug Enforcement Agency ("DEA") Group Supervisor ("GS") Sam Rahi and Special Agent ("SA") Shane Reese approached Leyva at the hotel and identified themselves as police.  Def's Br. at 2-3; Gov't Br. at 5.  GS Rahi had his gun in his hand, but was not pointing it at Leyva; SA Reese did not draw his gun.  Def's Br. at 3; Gov't Br. at 5.  The officers instructed Leyva to stay where she was, Gov't Br. at 5, and asked if she knew why the police were there, Def's Br. at 3; Gov't Br. at 6.  Leyva responded, "I'm in big trouble," and when asked to clarify, she said, "It's about the package I picked up from the old man."  Def's Br. at 3; Gov't Br. at 6.  GS Rahi asked her where the package was, and she told him that it was still in the car.  Def's Br. at 3; Gov't Br. at 6.  At that point, GS Rahi handcuffed Leyva and asked if she wanted to cooperate; she said yes.  Def's Br. at 3; Gov't Br. at 6.

GS Rahi then questioned Leyva about the person to whom she was supposed to take the package; she responded, "[a] man."  Def's Br. at 3; Gov't Br. at 6.  GS Rahi asked her if the delivery would take place in a hotel room, and whether she had a room at the hotel.  Def's Br. at 3; Gov't Br. at 6.  She said "No."  Def's Br. at 3; Gov't Br. at 6.  He then asked if the man would be coming to the hotel to pick up the package, and Leyva said "Yes."  Def's Br. at 3; Gov't Br. at 6.

At this point, approximately 1:35 p.m., GS Rahi removed Leyva's handcuffs and instructed his surveillance team to resume their covert roles. Def's Br. at 3; Gov't's Br. at 6-7. GS Rahi asked Leyva to explain how the heroin deal was supposed to take place. Def's Br. at 3; Gov't's Br. at 7. Leyva informed him that she had met a man that morning who had told her to pick up the package and bring it to St. Clair Shores. Def's Br. at 3; Gov't's Br. at 7. GS Rahi then attempted to ask additional questions about this man, but Leyva gave non-responsive answers ("These are very intelligent people you are dealing with"; "Did you see me with the old man?"). Def's Br. at 3-4; Gov't's Br. at 7. Leyva asked, "What if they don't come, what happens next?" Def's Br. at 4; Gov't's Br. at 7. Upon being told that she would go to jail, Leyva said, "I want to cooperate. I want to cooperate. I will tell you everything." Def's Br. at 4; Gov't's Br. at 7.

GS Rahi asked again about the man who was supposed to pick up the sham heroin and what type of vehicle he would be driving. Def's Br. at 4; Gov't's Br. at 7. Leyva said that she did not know, but said that she would make a call. Def's Br. at 4; Gov't's Br. at 7. GS Rahi and SA Reese allowed Leyva to make two unrecorded phone calls in Spanish. Def's Br. at 4; Gov't's Br. at 7-8. SA Reese, who has limited Spanish proficiency, advised GS Rahi that Leyva had told the person on the phone that "everything was good." Def's Br. at 4; Gov't's Br. at 8. Following the calls, GS Rahi asked again for a description of the man, and Leyva told him that the man "may not come until tomorrow." Def's Br. at 4; Gov't's Br. at 8. At this point, GS Rahi turned Leyva over to the Warren police for transportation to the Warren police station. Def's Br. at 4; Gov't's Br. at 8.

Inside the police vehicle, Leyva asked if she could call her daughter. Def's Br. at 4; Gov't's Br. at 8. GS Rahi dialed three numbers for Leyva, but no one answered. Def's Br. at 4; Gov't's Br. at 8. GS Rahi then advised Leyva that she could try to call again once at the police station.

Def's Br. at 4; Gov't's Br. at 8.  The Government states that the conversation between the agents and Leyva likely concluded around 1:45 or 1:50 pm.  Gov't's Br. at 8.

### B. <u>Miranda</u> warning and post-<u>Miranda</u> statements

Upon her arrival to the Warren police station, Leyva was left alone in an interview room. Gov't's Br. at 9.  At approximately 2:30 p.m., DEA Task Force Officer ("TFO") Ryan Pylak and SA Brandon Kushel entered the room to interview her.  <u>Id.</u>  Both TFO Pylak and SA Kushel were present at the St. Clair Shores hotel earlier that day, but neither had participated in the conversation between Leyva, GS Rahi, and SA Reese.  <u>Id.</u>

When the agents entered the room, Leyva was speaking on her cell phone in Spanish. 10/23/2016 Tr., Ex. A. to Def's Mot. to Suppress Statements at 1 (Dkt. 39-1).  She ended her call, and then asked the agents if she could make another.  <u>Id.</u>  They allowed her to do so; she made two more calls, which both went to voicemail.  <u>Id.</u> at 1-2.  After Leyva typed a text message to whomever she was attempting to reach, SA Kushel asked how her English was.[1]  <u>Id.</u> at 2.  Leyva responded, "A little."  <u>Id.</u>  SA Kushel followed up and asked, "Are you comfortable speaking and communicating in English language, or no?"  <u>Id.</u>  Leyva told him, "I needed a, somebody who speaks, somebody speak Spanish?"  <u>Id.</u>  SA Kushel and TFO Pylak conferred with one another and, upon realizing that they did not have an interpreter available, determined that Leyva had a strong enough command of English for them to proceed.  <u>Id.</u>  SA Kushel told Leyva that they would proceed in English, and told her to let him know if she did not understand something.  <u>Id.</u> at 3.  Leyva agreed.  <u>Id.</u>

---

[1] At the suppression hearing, TFO Pylak stated that he had reviewed the transcript and, though it was mostly accurate, he thought it may have occasionally listed TFO Pylak as the speaker when Leyva was speaking.  8/14/2017 Hr'g Tr. at 54 (Dkt. 76).  As these minor discrepancies are not important for purposes of the instant motions, the Court will rely on the transcript as an accurate representation of the conversation that took place.

SA Kushel and TFO Pylak then spent approximately four minutes explaining Leyva's rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). <u>Id.</u> at 3-8. During this time, Leyva made two references to an attorney, <u>id.</u> at 5, 7, which she argues were invocations of her right to counsel, Def's Br. at 9-11. She also stated once again that she needed someone who spoke Spanish. 10/23/2016 Tr. at 8. Nonetheless, when TFO Pylak asked, "[S]o do you wish to cooperate with us and talk to us?" she responded, "Yes, I'll cooperate." <u>Id.</u> at 7-8. SA Kushel then asked, "So you don't wish to have your lawyer present then," and she said "No." <u>Id.</u> at 8. The agents provided Leyva with a form indicating that she understood and was waiving her <u>Miranda</u> rights, which Leyva signed. <u>Id.</u> at 9; Warren Police Dep't Const'l Rights Cert. of Notification, Ex. C to Def's Reply (Dkt. 57-3).

The agents then questioned Leyva regarding her involvement in and knowledge of the sham heroin transaction. 10/23/2016 Tr. at 11-27. Leyva told the agents that she had traveled from Kansas City to Chicago, and then on to Detroit, at the request of a person from Mexico. <u>Id.</u> at 14-17. She was told that she would receive $5,000 for transporting a package in Detroit. <u>Id.</u> at 20. Leyva further claimed that she was given a phone by a man she met at K-Mart earlier on October 23, and that this man told her to destroy her own phone. <u>Id.</u> at 21-24.

Near the end of the conversation, the agents asked Leyva if she would give them permission to look at her cell phone. <u>Id.</u> at 27. At this point, Leyva said "No," and said she needed her lawyer. <u>Id.</u> at 29. The agents ended the conversation and seized Leyva's cell phone as they left. <u>Id.</u> at 30.

SA Kushel filed an application for a warrant to search the cell phone on November 2, 2016. App. For Search Warrant, Ex. A to Def's Mot. to Suppress Results of Search Warrant (Dkt. 40-1). In support of his application, SA Kushel included statements from Leyva's post-<u>Miranda</u> interview. Def's Mot. to Suppress Results at 2 (Dkt. 40). The search warrant was issued, and the

Government was able to recover text messages.  Id.  Leyva now seeks to suppress (i) the statements she made in both her pre- and post-Miranda interviews; and (ii) the results of the search warrant.

## II. ANALYSIS

Leyva argues that the statements she made to police both before and after receiving Miranda warnings should be suppressed.  First, she argues that her pre-Miranda statements should be excluded even for impeachment purposes.[2]  Second, she argues that the Miranda warnings she received were ineffective due to the police's use of a two-pronged interrogation.  Finally, she argues that her Miranda waiver was invalid, due to her limited English proficiency, her ignored invocations of the right to counsel, or because her statements were involuntary due to police coercion.  The Court will address each argument in turn.

### A. Voluntariness of Pre-Miranda Statements

Leyva argues that her statements made to GS Rahi at the hotel in St. Clair Shores should be suppressed for any purpose because she was not given Miranda warnings.  Def's Br. at 6-7.  She contends that the situation "was a custodial interrogation in which coercion is inherent, and as such distinguishes the line between voluntary and involuntary statements."  Id. at 6.

The Government responds that Leyva's statements are still admissible for purposes of impeachment because they were made voluntarily.  Gov't Br. at 17.  In reply, Leyva contends that the question of voluntariness is "at best[] academic" as she did not receive a Miranda warning, and all of her statements are therefore inadmissible.  Def's Reply Br. at 6 (Dkt. 57).  Additionally, Leyva raises for the first time an allegation that SA Reese threatened her in Spanish while at the hotel.  Id. at 2, 6.  She claims that he told her that if she did not cooperate, she would not see her

---

[2] The Government agrees that it will not use these statements in its case-in-chief, but argues that they may still be used to impeach Leyva.  Gov't Br. at 3.

grandchildren again. Id. Leyva also testified at the suppression hearing that SA Reese told her

that she would never see her children or grandchildren again. 8/14/2017 Hr'g Tr. at 83 (Dkt. 76).

Voluntary statements that are inadmissible due to the government's failure to provide

Miranda warnings are nonetheless admissible for impeachment purposes. Oregon v. Elstad, 470

U.S. 298, 307 (1985) (citing Harris v. New York, 401 U.S. 222 (1971)). A statement is involuntary

if it is "not 'the product of a rational intellect and a free will.'" United States v. Delaney, 443 F.

App'x 122, 128 (6th Cir. Nov. 21, 2011) (quoting Medeiros v. Shimoda, 889 F.2d 819, 823 (9th

Cir. 1989)). "A 'necessary predicate' to finding a confession involuntary is that was produced

through 'coercive police activity.'" Id. (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

The Sixth Circuit has established three requirements for finding that a statement was involuntary

as a result of police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in

question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct

was the crucial motivating factor in the defendant's decision to offer the statement." United States

v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999). The Government bears the burden of proving by a

preponderance of the evidence that a statement was made voluntarily. Id.

Leyva has not pointed to any police activity at the hotel, where she made her unwarned

statements, that was "objectively coercive." She notes that when the police approached her, "GS

Rahi's gun was at the ready, although SA Reese did not draw his weapon." Def's Br. at 6. The

mere presence of a police weapon does not render a statement involuntary, particularly where, as

here, "the display of weapons was not intended to 'extort' a confession by coercive means."

McCall v. Dutton, 863 F.2d 454, 459-460 (6th Cir. 1988) (upholding district court's determination

that there was no coercive police activity even where the petitioner "had been handcuffed, placed

on the ground, and surrounded by numerous police officers who 'yelled' and pointed weapons at

him"). Leyva later mentions that she was "threatened" that if someone did not arrive at the hotel to pick up the package, she would go to jail. Def's Br. at 18. But a threat to arrest is only coercive where the threat could not have been "lawfully executed." See United States v. Johnson, 351 F.3d 254, 263 (6th Cir. 2003) (holding that a threat to arrest defendant's half-sister was not coercive because the police had probable cause to believe that the half-sister had committed a crime). Here, there is no dispute that GS Rahi could and did lawfully arrest Leyva.

Leyva also raises in her reply and supplemental briefs an allegation that SA Reese threatened her in Spanish at the hotel. See Def's Reply Br. at 6; Def's Supp. Br. at 17 (Dkt. 82). The Court does not find Leyva's allegation credible. She testified at the suppression hearing that SA Reese threatened her in Spanish, telling her she would never see her children or grandchildren again, and then asked if she wanted to cooperate. 8/14/2017 Hr'g Tr. at 83. However, GS Rahi testified that he did not hear SA Reese speak to Leyva in Spanish. Id. at 20-21. He also stated that SA Reese was never alone with Leyva for any significant period of time; the only time that SA Reese and Leyva were alone together was for about a thirty-second period where GS Rahi was still within earshot. Id. at 21. GS Rahi testified that this thirty-second period was after Leyva had agreed to cooperate. Id.

Leyva also neglected to mention this alleged threat in her initial motion – where she spent several pages detailing the facts surrounding her arrest at the hotel – which suggests that such threat either did not happen or did not have quite the effect on Leyva as she would like the Court to believe. Additionally, when she was interrogated at the police station, Leyva made no mention of her desire to see her children or grandchildren. See generally 10/23/2016 Tr. She did not appear to be frightened as a result of a threat made by SA Reese. On the contrary, she was quite calm and again was permitted to use her cell phone several times to make phone calls and to attempt to send

text messages. Therefore, even if SA Reese made such a threat, and such threat was objectively coercive, it was not "sufficient to overbear [Leyva's] will." Mahan, 190 F.3d at 422.

Accordingly, as there was no police coercion at the hotel, Leyva's statements were made voluntarily and thus may be used at trial for purposes of impeachment.

**B. Effectiveness of <u>Miranda</u> Waiver**

Leyva argues that the Miranda warnings that she received at the Warren police station were not effective because they were part of a "two-prong interrogation." Def's Br. at 16. Leyva contends that she was questioned initially by GS Rahi, who did not provide her Miranda warnings; after she made incriminating statements to GS Rahi, TFO Pylak and SA Kushel continued the police interrogation and offered the Miranda warnings "mid-stream." Id. at 18-19. Leyva argues that under Missouri v. Seibert, 542 U.S. 600 (2004), her Miranda waiver was not effective because "the initial [unwarned] interrogation . . . operated to thwart Miranda's purpose of reducing the risk that [the] coerced confession would be admitted." Def's Br. at 20.

In Seibert, Missouri police officers employed a deliberate two-stage interrogation technique, where the officer would interrogate the suspect without Miranda warnings until the suspect confessed. 542 U.S. at 604. The officer would then provide the Miranda warnings, obtain a waiver, and then lead the suspect over the same ground. Id. The Seibert plurality concluded that inserting Miranda warnings into the middle of "coordinated and continuing interrogation" would deprive a defendant of "his ability to understand the nature of his rights and the consequences of abandoning them." Id. at 613-614.

The Sixth Circuit, in United States v. Ray, 803 F.3d 244, 272 (6th Cir. 2015), adopted the five-factor test outlined by the plurality in Seibert to determine whether an impermissible two-step interrogation had taken place. First, the court is to examine "the completeness and detail of the

questions and answers in the first round of interrogation." Seibert, 542 U.S. at 615. This factor weighs slightly in favor of the Government. GS Rahi's questions at the hotel were fairly broad and incomplete, as they were focused on what would be happening in the immediate future – not what led Leyva to the hotel that day. Leyva's responses were also vague, and she never admitted to knowing what was in the bag nor provided the identity of the man to whom she was supposed to deliver the bag. Cf. United States v. Ray, 690 F. App'x 366, 373 (6th Cir. June 8, 2017) (finding the first Seibert factor weighed in favor of the defendant where "the officers still asked Ray all the questions they needed to make an arrest, tailor their post-Miranda interrogation, and secure a conviction").

The second factor is "the overlapping content of the two statements." Seibert, 542 U.S. at 615. This factor weighs in the Government's favor. The questions at the hotel were primarily focused on the future – GS Rahi asked Leyva where she was supposed to deliver the package, where the delivery would occur, and for a description of the man who would be coming to pick it up. At hearing, GS Rahi testified that "[A]s a supervisor, my number one thing is safety . . . when it develops in front of you, you don't know if she's taking the bag to a bad guy, he's waiting to ambush her, ambush us so we're trying to identify what's going on in our surroundings first." 8/14/2017 Hr'g Tr. at 17. In contrast, the questions at the police station were focused on what led to Leyva's presence at the hotel. SA Kushel asked her to "take [him] through what happened today[,]" 10/23/2016 Tr. at 11; "who contacted [Leyva] to pick up this package[,]" id. at 14; and "how [Leyva] [got] from Kansas to here[,]" id. at 15. The questions did not significantly overlap and were focused on different topics.

Third, the court examines "the timing and setting of the first [interrogation] and the second." Seibert, 542 U.S. at 615. This factor also weighs slightly in favor of the Government.

In United States v. Pacheco-Lopez, 531 F.3d 420, 427 (6th Cir. 2008), the court found that the third factor favored suppression, where the interrogations took place in the same place and "the break [between interrogations] only lasted for the amount of time it took the investigators to read Lopez the Miranda warning"). Similarly, in United States v. Ashmore, 609 F. App'x 306, 317 (6th Cir. 2015), the court found that the third factor favored suppression because "the second interrogation followed shortly after the first; [and] the setting of both interrogations was the same." Here, Leyva's first interrogation took place at the hotel, a little less than an hour before her second interrogation took place at the police station. While the time lapsed was not the "three hours" found acceptable in Coomer v. Yukins, 533 F.3d 477, 490 (6th Cir. 2008), it was still sufficient for Leyva to understand that the circumstances between the two interrogations had changed.

The next factor is "the continuity of police personnel." Seibert, 542 U.S. at 615. Both TFO Pylak and SA Kushel, who questioned Leyva at the police station, were present at the hotel where she was arrested. SA Kushel did not have any interaction with Leyva at the hotel, 8/14/2017 Hr'g Tr. at 56, but TFO Pylak was introduced to Leyva there and spoke to her briefly about her transport to the police station, id. at 52-53. However, neither TFO Pylak nor SA Kushel was present to hear SA Rahi's questioning of Leyva at the hotel, id. at 26, and TFO Pylak testified that he did not ride with Leyva from the hotel to the police station, id. at 53. Cf. Ray, 690 F. App'x at 375 (finding that this factor weighed in favor of the defendant where the police officers "were within hearing of most, if not all, of the conversations and questioning while Ray was in custody and making his pre-Miranda statements"). The Court concludes that this factor is neutral.

Finally, the Court looks at "the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 615. This final factor weighs in favor of the Government. In Seibert, the police officer began the second round of questioning by

saying, "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" Id. at 604.  Here, none of the questions asked by the agents at the police station suggest that they had any knowledge of the questioning that had taken place at the hotel, and the agents never "refer[red] back to the confession already given." Id. at 616.

Leyva argues that the agents at the police station never advised her that her prior statements could not be used against her.  Def's Br. at 19.  While the absence of such advice is "a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation," Seibert, 542 U.S. at 616 n. 7, it is not dispositive here.  See United States v. McConer, 530 F.3d 484, 498 (6th Cir. 2008) (applying the Seibert plurality's test to a defendant's post-Miranda statements and concluding that his Miranda rights were not violated even when the police "never advised [defendant] in the kitchen that his prior statement about his living situation would not be used against him").  Given all of the previously-mentioned indicators that the interrogation at the police station was distinct from the interrogation at the hotel, a reasonable person in Leyva's position would have understood the Miranda warnings "to convey a message that she retained a choice about continuing to talk." Seibert, 542 U.S. at 617.

Based upon the foregoing factors, the court determines that "a reasonable person in [Leyva's] shoes could have seen the station house questioning as a new and distinct experience," and "the Miranda warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." Seibert, 542 U.S. at 616.  As such, the Miranda warnings provided to Leyva at the Warren police station were effective.

## C.  Validity of **Miranda** Waiver

A suspect's waiver of her Miranda rights must be made "voluntarily, knowingly, and intelligently." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  A voluntary waiver is one that is

"the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The question is not whether the suspect "knew and understood every possible consequence of a waiver, but rather whether he knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." United States v. Lawrence, 735 F.3d 385, 437 (6th Cir. 2013) (internal quotations omitted). The Government bears the burden of showing waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Leyva argues that her waiver of her Miranda rights was invalid, because (i) she did not understand that she was waiving her rights due to her limited English proficiency; (ii) she had invoked the right to counsel and was ignored; or (iii) her statements were involuntary due to the police officers' repeated references to cooperation.

### 1. Leyva's English Proficiency

Leyva argues that she did not "knowingly and intelligently" waive her rights as is required by Miranda, because she did not understand what the agents told her in English. Def's Br. at 12. During her interrogation at the police station, Leyva twice asked the officers for an interpreter who spoke Spanish. 10/23/2016 Tr. at 2, 8. Although the agents provided Leyva with a form in English setting forth her Miranda rights, Leyva testified at the suppression hearing (through an interpreter) that she is unable to read English. 8/14/2017 Hr'g Tr. at 81. She further testified that if her rights had been explained to her in Spanish, she would not have signed the waiver. Id. at 82.

"One precondition for a voluntary custodial confession is a voluntary waiver of Miranda rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner." United States v. Heredia-Fernandez, 756 F.2d 1412, 1415 (9th Cir.

1985). However, courts have found that a defendant's waiver may be valid even when the defendant's native language was not English. See United States v. Alvarez, 54 F. Supp. 2d 713, 717 (W.D. Mich. 1999) (reviewing cases).[3] In United States v. Al-Cholan, 610 F.3d 945 (6th Cir. 2010), the Sixth Circuit upheld the district court's finding that the defendant understood English sufficiently well to render his Miranda waiver valid. Id. at 954. Among other findings, the district court had noted that the defendant "had resided in the United States for twelve years," and "[a]s part of the naturalization process, he had passed an English proficiency test and sworn under penalty of perjury that he could speak and understand English." Id.

Leyva has lived in the United States for almost thirty years, 8/14/2017 Hr'g Tr. at 90, and has been a U.S. citizen for nineteen years, id. at 86. She admitted that as part of the naturalization process, she was required to take an exam in English. Id. at 87. She has also taken English classes, from which she received a certificate and diploma. Id. at 88. Leyva also went through the federal court system in the mid-2000s, where her attorney on two occasions represented to the court that she was able to read English. See United States v. Reyes-Lopez et al., No. 2:04-cr-20115-JWL-JPO, Tr. of Change of Plea Hr'g 25, Dkt. 775 (Aug. 17, 2006) ("She has read through an English portion of [the plea agreement] with an interpreter, and my client does read English."); Reyes-Lopez, Tr. of Sent. Hr'g 3, Dkt. 776 (Feb. 26, 2007) ("I have not had [the presentence investigation report] translated because she reads English pretty well.").

---

[3] Leyva argues that her case has "compelling similarities" to United States v. Garibay, 143 F.3d 534 (9th Cir. 1998), where the Ninth Circuit reversed the district court's finding that a Spanish-speaking defendant made a knowing and intelligent waiver of his Miranda rights when they were explained to him in English. Def's Br. at 13. However, in Garibay the defendant had severe intellectual disabilities, had no previous experience with the criminal process, and produced independent evidence of his inability to understand English. Garibay, 143 F.3d at 538-539. None of those additional factors is present in this case.

Although the video and transcript of the interrogation reflect some communication difficulties between Leyva and the two agents, it is clear that Leyva was able to understand the officers' questions and provide responsive answers. See 10/23/2016 Tr. at 12 (SA Kushel: "Was it a male or female?" Leyva: "Uh . . . male." SA Kushel: "What did he look like?" Leyva: "He look?" SA Kushel: "Yeah, like how did he look?" Leyva: "He's an old guy."). TFO Pylak testified that, in his opinion, "she was able to communicate effectively." 8/14/2017 Hr'g Tr. at 64-65.

When the agents first asked if Leyva understood that she had the right to remain silent, she said no. 10/23/2016 Tr. at 3. The agents then explained her <u>Miranda</u> rights to her, and when they asked again if she understood, she then said yes. <u>Id.</u> at 7-8. While it may have been preferable for the agents to provide Leyva with a card that listed her <u>Miranda</u> rights in Spanish, their failure to do so does not render her waiver invalid. SA Kushel testified at the suppression hearing that he was confident that Leyva had understood her rights. 8/14/2017 Hr'g Tr. at 79. After reviewing the video, the Court agrees.

Accordingly, the Court finds that Leyva understood her rights as explained to her in English such that her waiver was knowing and intelligent.

### 2. Leyva's Invocation of the Right to Counsel

Leyva argues that during the interrogation at the police station, she twice invoked her right to counsel. Def's Br. at 9-10. She argues that these invocations were ignored by the agents, in violation of <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981). Def's Br. at 9. The Supreme Court in <u>Edwards</u> held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." <u>Id.</u> at

484. Once an accused has invoked the right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." Id. at 484-485.

An invocation of the right to counsel must be unambiguous. Davis v. United States, 512 U.S. 452, 459 (1994). A "reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel" does not require police to cease their questioning. Id. (holding that "Maybe I should talk to a lawyer" is not an unequivocal request for counsel); see also United States v. Amawi, 695 F.3d 457, 485 (6th Cir. 2012) ("Stating that 'I'm going to wait' and asking 'is there a lawyer on board' is neither a clear nor unequivocal invocation of the right to remain silent or the right to counsel."); Cornelison v. Motley, 395 F. App'x 268, 274 (6th Cir. Sept. 2, 2010) (finding reasonable the Kentucky Supreme Court's conclusion that defendant's request for counsel was ambiguous where defendant asked "What if I want my lawyer present first" and then signed a waiver form "while stating that he would like a request for a lawyer 'on the record'"); Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000) (finding objectively reasonable the state court's holding that the suspect's guardian's remark, "Should . . . We're going to have to get a lawyer then and should his mother be notified?" was not an invocation of the right to counsel).

The first time that Leyva made a reference to a lawyer was after SA Kushel had explained that she had a right to have counsel present and asked if she understood:

Leyva:          I understand about this – it's my [UI] – I can talk to my lawyer, right?

SA Kushel:      That's – yes, if you want to, yes.

Leyva:          When I talk to first to you here, or I'm needing my lawyer here first?

SA Kushel:      That's up to you.

| Leyva: | It's up to me? |
|---|---|
| SA Kushel: | Mm-hmm. |
| Leyva: | And if, like, if – if waiting for my lawyer? |
| SA Kushel: | Are you saying you would like to have a lawyer present? |
| Leyva: | Mm-hmm. |

10/23/2016 Tr. at 5.

After reviewing the video tape of Leyva's interrogation, the Court concludes that Leyva did not make an unambiguous demand for a lawyer at that point. A suspect who wishes to invoke her right to counsel must articulate this desire "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be request for an attorney." Davis, 512 U.S. at 459. When she questioned SA Kushel about the sequence of talking to the officers and talking to a lawyer, he said that it's up to her; she responds "Mm-hmm" -- which appears to be an expression of her understanding that she could have a lawyer at some point in the process. The next statement by SA Kushel is not expressly connected to the sequencing of talking to the officers or talking with a lawyer. His question whether she wants a lawyer and her response of "Mm-hmm" appear to be a confirmation that she wants a lawyer, but not that she wants one immediately and that she wanted to cut off the interrogation. In context, it was not unreasonable for SA Kushel to continue to explain that she could continue to talk to law enforcement or get a lawyer immediately, but not both. A reasonable police officer in these circumstances would have understood Leyva's "mm-hmm" as an invitation to continue the discussion about her rights, rather than a request for an attorney and a cessation of questioning.

The agents did in fact continue to explain Leyva's Miranda rights. The next time that Leyva mentions an attorney is about a minute later:

| TFO Pylak: | Okay, so if you want to have an attorney, you can have an attorney, okay? However, if you want an attorney, then we can't talk to you. There's no talking. Then you just stay here and you wait for your lawyer, and you deal with your lawyer. |
|---|---|
| Leyva: | Mm-hmm. |
| TFO Pylak: | But at that point, then that's where the cooperation stops. |
| Leyva: | I'm not cooperating because you say [UI] waiting for my lawyer.[4] |

10/23/2016 Tr. at 6-7.

This too is not an unequivocal request for an attorney. Leyva seems to be repeating her understanding of what the officers had just told her – she can choose not to cooperate and instead wait for her lawyer. TFO Pylak responded to Leyva's statement by saying, "So, but you need to understand, if you want a lawyer, you can have a lawyer. If at any time you want to stop talking, you can stop talking." Id. at 7. This was an appropriate response to Leyva's ambiguous statement. See Davis, 512 U.S. at 461 ("Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."). Shortly thereafter, she was asked if she wanted to have her lawyer present, and Leyva said "No." Id. at 8. This unambiguous statement that she did not want a lawyer brought the discussion regarding counsel to an unambiguous conclusion.

Accordingly, the Court finds that Leyva did not invoke her right to counsel.

### 3. Involuntariness of Leyva's Waiver

_____

[4] In Leyva's opening brief, she argues that she stated, "I'm not cooperating with you I'm going to wait for my lawyer." Def's Br. in Supp. 15. However, in her reply and supplemental briefs, Leyva relies on the transcript – "I'm not cooperating because you say [UI] waiting for my lawyer." See Def's Reply Br. at 9; Def's Supp. Br. at 15. After viewing the videotape of the interrogation, introduced at the hearing as Gov't Ex. 1, the Court agrees that the transcript is an accurate reflection of what was said.

Finally, Leyva argues that her post-<u>Miranda</u> statements should be suppressed because they were involuntary. Leyva first argues that TFO Pylak and SA Kushel used some form of the word "cooperation" more than ten times when they explained her <u>Miranda</u> rights, which amounted to coercion rending her statements involuntary. Def's Br. at 15. Leyva points to <u>United States v. Harrison</u>, 34 F.3d 886 (9th Cir. 1994), for support. In <u>Harrison</u>, an agent asked the defendant whether "whether she thought it preferable if the judge were informed that she had cooperated or not cooperated." <u>Id.</u> at 892. The Ninth Circuit found that a suggestion that the agent might inform the court that the defendant had not cooperated was improper and rendered her subsequent statements involuntary. <u>Id.</u> at 891. In so doing, the court quoted from <u>United States v. Tingle</u>, 658 F.2d 1332 (9th Cir. 1981):

> Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment.

<u>Id.</u> (quoting <u>Tingle</u>, 658 F.2d at 1336 n. 5).

Neither TFO Pylak nor SA Kushel ever represented to Leyva that her failure to cooperate would be communicated to a prosecutor or a judge. They merely informed her that if she chooses to remain silent or wait for a lawyer, cooperation will stop. <u>See</u> 10/23/2016 Tr. at 6 (TFO Pylak: "However, if you want an attorney, then we can't talk to you. . . . But at that point, that's where the cooperation stops."). Such statement does not contain any suggestion that a prosecutor would be informed of her failure to cooperate, or that a cessation of her cooperation would carry <u>any</u> negative consequences. For that matter, neither agent ever expressed to Leyva that any favorable consequences would result if she <u>did</u> cooperate. Thus, as the agents' statements were not

"objectively coercive," <u>United States v. Mahan</u>, 190 F.3d 416, 422 (6th Cir. 1999), Leyva's statements were not the result of coercive police activity and were therefore voluntary.[5]

Leyva also argues that her statements made at the police station are involuntary because of SA Reese's coercive statements made at the hotel. Def's Reply Br. at 6. However, the Court has already determined that Leyva's allegations of SA Reese's misconduct are not credible.

Accordingly, the Court concludes that Leyva's statements were voluntary.

### D. Motion to Suppress Results of Search Warrant

Leyva argues that the results of the search warrant for her cell phone should be suppressed, as statements taken in her post-<u>Miranda</u> interview, in violation of her constitutional rights, served as the basis for the application for the search warrant. Def's Br. in Supp. of Mot. to Suppress Results at 2-3. As the Court has concluded that Leyva's post-<u>Miranda</u> statements were not taken in violation of her constitutional rights, there is no reason to consider suppression of the results of the search warrant.

Accordingly, Leyva's motion regarding the search warrant is denied.

### III. CONCLUSION

---

[5] Leyva also argues that, considering the totality of the circumstances, her statements should be found involuntarily made because she was confused by the agents' disregard of her invocations of her right to counsel. Def's Br. at 6. However, as the Court has determined that Leyva did not in fact invoke her right to counsel, this does not factor into the voluntariness determination.

Leyva further claims that the agent did not read aloud the following right when he read verbatim from DEA-13A, the DEA's rights warning card: "You can decide at any time to exercise these rights and not answer any questions or make any statements." Def's Br. at 14. However, this right does not actually appear on DEA-13A, <u>see</u> Gov't's Br. n. 6; Def's Reply Br. at 4, and at any rate is not necessary to fully inform Leyva of her rights. <u>See</u> <u>Florida v. Powell</u>, 559 U.S. 50, 60 (2010) ("The four warnings <u>Miranda</u> requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed.").

For the foregoing reasons, Defendant Leyva's Motion to Suppress Statements (Dkt. 39) and Motion to Suppress Results of the Search Warrant (Dkt. 40) are denied.

SO ORDERED.

Dated: October 18, 2017                    s/Mark A. Goldsmith
      Detroit, Michigan                  MARK A. GOLDSMITH
                                        United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 18, 2017.

                    s/Karri Sandusky
                    Case Manager